**Baker & Hostetler LLP**
45 Rockefeller Plaza New York, NY10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>FAIRFIELD SENTRY LIMITED, GREENWICH SENTRY, L.P., and GREENWICH SENTRY PARTNERS, L.P.,<br><br>Defendants. | Adv. Pro. No. _____ (BRL) |

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"),[1] by and through his undersigned counsel,

for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff").  In early December 2008, BLMIS generated customer account

statements for its nearly 7,000 customer accounts at BLMIS.  When added together, these

statements purportedly show that customers of BLMIS had approximately $64.8 billion invested

with BLMIS.  In reality, BLMIS had assets on hand worth only a small fraction of that amount.

On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony

counts.  Defendants received avoidable transfers from BLMIS, and the purpose of this

proceeding is to recover the avoidable transfers received by one or more of the Defendants.

2.      Defendants are three separate hedge funds marketed and managed by a labyrinth

of affiliated entities known as the Fairfield Greenwich Group.  The Fairfield Greenwich Group

("FGG") is controlled by three principal partners, Walter Noel, Jeffrey Trucker and Andres

Piedrahita.  FGG and the Defendant hedge funds worked closely with Madoff and/or BLMIS

throughout a nearly twenty year relationship, including, but not limited to:  (1) coordinating

responses to United States Securities Exchange Commission investigations of BLMIS, (2)

collaborating in SEC filings, and (3) obtaining new money used by BLMIS to perpetuate his

Ponzi scheme.  Despite assurances to the Defendants' investors, Defendants, and their managers,

did little, if any, due diligence of BLMIS and instead ignored multiple red flags because with the

Defendants' continued investment in BLMIS, the investment manager of the Defendant funds

---

[1] For convenience, subsequent references to SIPA shall omit "15 U.S.C."

reaped massive fees, in excess of hundreds of millions of dollars, purportedly for investment

performance which has proven to be nothing but fiction.

3.       From at least 1996 through 2007, the Defendant funds received from BLMIS

unrealistically high and consistent annual returns of between 10% and 21% in contrast to the

vastly larger fluctuations in the S&P 100 Index on which BLMIS' trading activity was

purportedly based during that time period.  Between 1998 and 2008, more than 280 purported

trades reflected on the Defendants' monthly BLMIS customer account statements were allegedly

exercised at prices outside the daily range for such securities traded in the market on the days in

question, a fact that could easily have been confirmed by any investment professional managing

the accounts.  Defendants knew or should have known that BLMIS was engaged in fraud based

on these facts and the numerous other indicia of fraud described herein.

4.       This adversary proceeding is brought pursuant to SIPA §§ 78fff(b) and 78fff-

2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of 11 U.S.C. §§ 101 *et. seq.* (the

"Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §270 *et.

seq.* (McKinney 2001)), and other applicable law, for turnover, accounting, preferences,

fraudulent conveyances, damages and objection to claim in connection with certain transfers of

property by BLMIS to or for the benefit of Defendants (the "Transfers").  The Trustee seeks to

set aside the Transfers and preserve the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

5.       This is an adversary proceeding brought in this Court, the Court in which the

main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.

The SIPA Proceeding was originally brought by the Securities Investor Protection Corporation

("SIPC") in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

6.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), (F), (H) and (O).

7.    Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

8.    On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

9.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order, which appointed Lee S. Richards, Esq., as receiver for the assets of BLMIS.

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under section 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

10.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an

application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC

consented to a combination of its own action with SIPC's application.

11.     Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

>   (a)     appointed the Trustee for the liquidation of the business of BLMIS
>           pursuant to SIPA § 78eee(b)(3);
>
>   (b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
>           SIPA § 78eee(b)(3); and
>
>   (c)     removed the case to this Bankruptcy Court pursuant to SIPA §
>           78eee(b)(4).

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

12.     By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

13.     At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned

*United States v. Madoff,* Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal

information filed against him by the United States Attorneys' Office for the Southern District of

New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the

investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23: 14-17.)  Additionally, Madoff

asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."
(Id. at 23: 20-21.)

14.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and
paying out customer property to BLMIS' customers, assessing claims, and liquidating any other
assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of
marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway.  However,
such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars
that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority
under SIPA and the Bankruptcy Code to pursue recovery from customers who received
preferences, non-existent principal and/or payouts of fictitious profits to the detriment of other
defrauded customers whose money was consumed by the Ponzi scheme.  Absent this or other
recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A)
through (D) of SIPA § 78fff-2(c)(1).

15.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy
trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant
to 15 U.S.C. § 78fff(b).  Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy
Code are applicable to this case.

16.     Pursuant to SIPA § 78*lll*(7)(B), the Filing Date is deemed to be the date of the
filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and
the date of the commencement of the case within the meaning of section 544 of the Bankruptcy
Code.

17.     The Trustee has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including (11 U.S.C. § 101 *et seq*.), including sections 323(b) and 704(a)(1) because, among other reasons:

(a)     BLMIS incurred losses as a result of the claims set forth herein;

(b)     The Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes; and

(c)     The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury, in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

## THE FRAUDULENT PONZI SCHEME

18.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1960, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).  By that registration, BLMIS is a member of SIPC.

BLMIS had three business units:  investment advisory (the "BLMIS' IA Business"), market making and proprietary trading.

19.    Outwardly, Madoff ascribed the BLMIS' IA Business's consistent investment success to his investment strategy called the "split-strike conversion" strategy.  Madoff promised customers that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest publicly traded companies.  The basket of stocks would be intended to mimic the movement of the S&P 100 Index.  Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the customers' funds would intermittently be out of the market.  During these times, Madoff asserted that the funds would be invested in United States-issued securities.  The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts.  Madoff purported to purchase and sell option contracts corresponding to the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

20.    Although customers of the BLMIS' IA Business received monthly or quarterly statements purportedly showing the securities that were held in, or had been traded through, their accounts, and the growth of and profit from those accounts over time, these statements were a complete fabrication.  The securities purchases and sales depicted in the account statements never occurred and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts at BLMIS.  Indeed, based on the Trustee's investigation to date, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the split/strike conversion strategy at the Depository Trust & Clearing Corporation, the clearing

house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

21.     Prior to his arrest, Madoff assured customers and regulators that he conducted trades on the Over-the-Counter ("OTC") index options market, after hours.  To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity, the majority of interest in which was held by Madoff.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the BLMIS' IA Business customers.

22.     Additionally, based on the Trustee's investigation to date, there is no evidence that the BLMIS' IA Business ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased.  All traded options related to S&P 100 companies, including options on the index itself, clear through the Options Clearing Corporation ("OCC").  Based on the Trustee's investigation to date, the OCC has no records of the BLMIS' IA Business having transacted in any exchange-listed options.

23.     For all periods relevant hereto, the BLMIS' IA Business was operated as a Ponzi scheme and Madoff and BLMIS concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was not set aside to buy securities as purported.  Instead, the money was primarily used to make the distributions to, or payments on behalf of, other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the fraudulent Ponzi operation going and to enrich Madoff, his associates and others, including the Defendant funds'

managers, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

24.      During the Ponzi scheme, certain investors requested and received from BLMIS distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their BLMIS accounts, or removed portions of them, and were paid consistently with the BLMIS statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments into accounts with BLMIS for themselves or related parties.

25.      When payments were made to or on behalf of these investors, including the Defendants, the falsified monthly BLMIS statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in the BLMIS customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors the inflated amount reflected in the falsified BLMIS customer statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances at BLMIS.

26.      BLMIS used the funds deposited from investors or investments to continue operations and pay redemption proceeds to or on behalf of other BLMIS investors and to make other transfers.  Due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other BLMIS account holders,  BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was able to stay afloat only by using the principal invested by later customers to pay other earlier customers or their designees.

27.     In an effort to hinder, delay and defraud authorities from detecting the fraud, Madoff did not register BLMIS as an Investment Advisor until September 2006.

28.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In fact, in January 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

29.     Not only did Madoff seek to evade regulators by other means, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three person accounting firm in Rockland County, New York.  Of the three employees at the firm, one employee was an assistant and one was a semi-retired accountant living in Florida.  These audit reports are required from every securities broker-dealer registered with the SEC under 15(b) of the 1934 Act.

30.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all times relevant hereto, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities, (ii) it could not meet its obligations as they came due, and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

31.     This and similar complaints are being brought to recapture monies paid to or for the benefit of BLMIS customers so that these recovered funds can be placed in the fund of customer property and be distributed *pro rata* among all of the victims of BLMIS in accordance with SIPA § 78fff-2(c)(1).

## THE DEFENDANTS AND THE TRANSFERS

32.     Defendant Fairfield Sentry Limited ("Fairfield Sentry") is an international business company, organized under the laws of British Virgin Islands.  Fairfield Sentry's registered agent is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

33.     Defendant Greenwich Sentry, L.P. ("Greenwich Sentry") is a limited partnership, organized under the laws of the State of Delaware.  Greenwich Sentry's registered agent is Corporation Service Company, 2711 Centreville Road, Suite 400, Wilmington, Delaware 19808.

34.     Defendant Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners") is a limited partnership, organized under the laws of the State of Delaware.  Greenwich Sentry Partners' registered agent is Corporation Service Company, 2711 Centreville Road, Suite 400, Wilmington, Delaware 19808.  Defendants Fairfield Sentry, Greenwich Sentry and Greenwich Sentry Partners are referred to collectively as "Defendants" or "Defendant funds".

35.     At all times relevant hereto, one or more of the Defendants was a customer of BLMIS' IA Business, which operated its principal place of business in New York, New York.  In addition, the Defendants utilized United States banks when they redeemed funds distributed to them by BLMIS.

36.     According to BLMIS' records, Defendants maintained the accounts with BLMIS set forth on Exhibit A (the "Accounts").  The Accounts were opened on or about the dates set forth in Exhibit A.  The Defendants executed a variety of agreements related to the accounts (the "Account Agreements").  The Defendants delivered such papers to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.  At least one of Fairfield Sentry's

Customer Agreements was deemed made in the State of New York under the "Choice of Laws"

provision.  On May 12, 2009,  FGG issued a press release stating the Defendant funds actively

monitored their investment with Madoff and conducted due diligence both in Bermuda and New

York, New York.

37.      By their terms, the Account Agreements were to be performed in New York, New

York through securities trading activities that would take place in New York, New York.  The

Accounts were held in New York, New York, and the Defendants consistently wired funds to

BLMIS' account at JPMorgan Chase & Co., Account # 000000140081703 (the "BLMIS Bank

Account") in New York, New York for application to the Accounts and the conducting of trading

activities.

38.      Between December 1, 1995 and the Filing Date, the Defendants invested

approximately $4.5 billion with BLMIS through 242 separate transfers via check and wire

directly into the BLMIS Bank Account.  The BLMIS Bank Account was maintained at a

JPMorgan Chase & Co. branch in New York, New York.  Defendants have intentionally taken

advantage of the benefits of conducting transactions in the State of New York and have

submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

39.      Prior to the filing date, BLMIS made payments or other transfers (collectively, the

"Transfers") to one or more of the Defendants.  The Transfers were made to or for the benefit of

one of more of the Defendants and include, but are not limited to, the Transfers listed on Exhibit

B.

40.      Upon information and belief, Defendants knew or should have known that the

BLMIS' IA Business was predicated on fraud.  Hedge funds and funds of funds like the

Defendants were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff and BLMIS. The Defendants failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme. Among other things, the Defendants were on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

*Impossibilities Inherent in BLMIS' Investment Strategy*

a.      BLMIS' investment strategy would have been impossible to execute. The number of put and call options that BLMIS would have had to buy or sell on any given day often exceeded the number of put and call options bought or sold *in the entire market* on those days. In fact, there were not enough put option contracts available to enable anyone to hedge a fund the size of BLMIS the way Madoff claimed to be doing. In addition, BLMIS' operations and purported trades failed to make any impact on the OTC index options market, which would have been surprising given the volume of trades that BLMIS was supposedly making.

b.      The type of options BLMIS purported to purchase and sell was counter-intuitive. The Defendants were undoubtedly aware that investors are required to pay elevated transaction fees for the customization features and secrecy offered by OTC options, and that BLMIS could have utilized less exotic but fully transparent options at considerable cost savings, yet elected not to do so.

c.      **HIGH AND UNUSUALLY CONSISTENT RETURNS**

BLMIS reported returns that were too good to be true, reflecting a pattern of abnormal

profitability, both in terms of consistency and amount that was simply not credible. The

Defendants received annual rates of return on their investments with BLMIS, ranging on average

from approximately 10% to 21% for the period from 1996 through 2007. Each of the

Defendants' accounts incurred a negative return in a particular month in only a small percentage

of the months of purported trading, as summarized below:

| A/C# | Account Name | 1996 through 2007 | | |
| | | Months with Negative Returns | Total Months with Purported Trading | % of Total |
|---|---|---|---|---|
| 1FN012/69 | Citco Global Custody N V FBO Fairfield Sentry Ltd | 4 | 144 | 2.8% |
| 1FN045/70 | Citco Global Custody N V FBO Fairfield Sentry Ltd | 4 | 144 | 2.8% |
| 1G0092 | Greenwich Sentry LP c/o Fairfield Greenwich Group | 4 | 144 | 2.8% |
| 1G0371 | Greenwich Sentry Partners LP c/o Fairfield Greenwich Group | 1 | 20 | 5.0% |
| | | 13 | 452 | 2.9% |

For the period from January 1996 through and including December 2007 the S&P 500

had a total of 52 months which generated negative returns, equal to 36.1% of the total number of

months during that period.

d.    ***PRICES OUTSIDE DAILY RANGE***

At times, the Defendants' monthly account statements reflected trades purportedly

purchased or sold on behalf of the Defendants' account in certain securities that were allegedly

executed at prices outside the daily range of prices for such securities traded in the market on the

days in question. For example, Fairfield Sentry's monthly BLMIS account statements for

October 2003 reported purchases of Intel Corporation (INTC) of 1,082,543 shares, 1,097,173

shares, and 67,837 shares with a settlement date of October 7, 2003. BLMIS records indicate

that the trade date for these transactions as October 2, 2003, at a price of $27.63. However, the

daily price range for Intel Corporation stock on October 2, 2003 ranged from a low of $28.41 to

a high of $28.95. In an example of a purported sale, Fairfield Sentry and Greenwich Sentry

Partners' monthly BLMIS account statements for December 2006 reported sales of Merck

(MRK) of 267,035 shares, 261,266 shares, 15,386 shares and 786 shares with a settlement date

of December 28, 2006, respectively.  BLMIS records reflect a trade date of December 22, 2006

at a price of $44.61 for all of these transactions.  However, the daily price range for Merck stock

on December 22, 2006 was a low of $42.78 to a high of $43.42.

     e.     ***PURPORTED TRADES SETTLED ON WEEKENDS/HOLIDAYS***

Certain of the Defendants' monthly BLMIS account statements reflected trades

purchased or sold on behalf of the Defendants' account in certain securities that were allegedly

settled on weekends and/or holidays.  For example, Defendant Fairfield Sentry's BLMIS

monthly account statements for the month of January 2000 for its accounts numbered 1FN069

and 1FN070, reported alleged purchases of 3,196 and 3,275 S&P 100 Index Put option contracts

and equal numbers of S&P 100 Index Call option contracts, respectively, which purportedly

settled on January 8, 2000 -- a Saturday.  These trades were clearly fictional and should have

been discovered by Defendant Fairfield Sentry.

     f.     ***UNREALISTICALLY HIGH VOLUMES OF EQUITIES TRADING***

Based upon the size of BLMIS' IA Business and the number of customers that invested

over the years, Madoff's purported split-strike conversion strategy would have required BLMIS

to execute a massive amount of equity trades on a given day.  BLMIS customer account

statements, like those of Defendants, reflected the purported purchases of large blocks of

securities in companies included in the S&P 100 Index – several of which are only traded on the

New York Stock Exchange ("NYSE") – in combination with purchases of S&P 100 index call

and put option contracts.  At times, the BLMIS account statements reflected volumes of trades in

certain S&P 100 companies that represented unrealistically high portions of the overall trading volume on the NYSE of those securities on the specified trade dates.

For example, Greenwich Sentry and Fairfield Sentry's monthly BLMIS account statements for July 1998 reported sales of Coca Cola Company (KO) of 540,160 and 551,619 shares for Fairfield Sentry's two accounts, and 42,282 shares for Greenwich Sentry's account, respectively, each with a trade date of July 17, 1998 and settlement date of July 22, 1998. The total volume of KO stock traded on the NYSE on the trade date of July 17, 1998 was 2,252,300. Based on the aggregate purported trades of Defendants' three accounts, the volume of the Defendants' alleged sales of KO represented approximately 50% of the total market volume of that security on that day. Such a percentage of the market volume in the Defendants' accounts was not credible. Defendants should have been on notice and seen this red flag.

g.      From 1998 to 2008, there are 180 instances where the shares purportedly traded by Defendants at BLMIS for a given stock on a particular day was in excess of 20% of the total market volume. Defendants knew or should have known that the trading volumes reported by BLMIS were highly unlikely and, at a minimum, put Defendants on notice to inquire about these abnormally high purchase volumes.

h.      ***OPTIONS IN EXCESS OF THE CBOE MARKET***

BLMIS' claimed "split-strike conversion strategy" required purchases of options on the S&P 100 index in combination with purchases of select underlying stocks that are components of the S&P 100 index. These options are traded on the Chicago Board Options Exchange, ("CBOE"), through a licensing agreement between CBOE and Standard & Poor's ("S&P"). As reported on the monthly account statements for January 2008 received by Defendant Fairfield

Sentry, on January 23, 2008, BLMIS purportedly bought a total of 23,435 and 23,381 OEY put options (with February expiration and a strike price of 600) for its accounts numbered 1FN069 and 1FN070, respectively, when the total volume traded on the CBOE on that date for such contracts was 8,645. Similarly, BLMIS purportedly sold a total of 23,435 and 23,381 OEY call options (with February expiration and a strike price of 610) for its accounts numbered 1FN069 and 1FN070, respectively, when the total volume traded on the CBOE on that date for such contracts was 631. In each instance, Defendants should have understood that the option volume being reported was impossible, as there were not that many option contracts available on the CBOE.

i.    BLMIS had purportedly told its investors that it purchased these options in the OTC market. Trading options in the OTC market would have likely been more expensive than trading over the CBOE, yet those costs did not appear to be passed on to BLMIS' investors. The absence of such costs, together with BLMIS' representation that it was trading in the OTC market, should have prompted sophisticated hedge funds like the Defendants to request verification of the trades and demand more transparency into the operations of BLMIS.

j.    BLMIS' statements to investors reflected a consistent ability over many years to trade stocks near their monthly highs and lows to generate consistent and unusual profits. No experienced investment professional could have reasonably believed that this could have been accomplished legitimately.

k.    At no time did the Defendants conduct a performance audit of BLMIS or match any trade confirmations provided by BLMIS with actual trades executed through any domestic or

foreign public exchange despite the fact the Defendants had hundreds of millions of dollars in assets and easily could have afforded to perform this task.

l.      The compensation system utilized by BLMIS was atypical in that BLMIS, the entity purportedly employing the hugely-successful and secret proprietary trading system, was compensated only for the trades that it executed, while Defendants' managers, whose only role was to funnel money received from investors in their respective funds to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS.  This compensation arrangement, together with the lack of transparency and other factors listed herein, should have caused experienced investment professionals to question Madoff's operation.

*Lack of Oversight of BLMIS by Independent Entities*

m.      BLMIS functioned as both investment manager and custodian of securities.  This arrangement eliminated another frequently utilized securities industry check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS to investors, regulators, and other outside parties.

n.      BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz ("Friehling"), an accounting firm that had only three employees, one of whom was semi-retired.  In fact, Friehling had not been subject to peer review by the American Institute of Certified Public Accountants ("AICPA") since 1993 and had avoided peer review by reporting to the AICPA that it did not even perform audits.  The Defendants did not investigate this accounting firm, which was responsible for ensuring that the

billions of dollars the Defendants had invested with Madoff was being properly managed, until

2005 when one of the Defendants' investors inquired as to who supervised activities at BLMIS.

o.      Jeffrey Tucker, a founding partner of FGG, reviewed the investor's question and

then asked others at FGG to provide him with additional information regarding Friehling.  In

response, Dan Lipton, partner and Chief Financial Officer of FGG, contacted Friehling and was

informed that Friehling had hundreds of clients and was well-respected in the community.

Without making any effort to confirm these statements, Lipton conveyed this information to

Tucker, who then directed Gordon McKenzie, the Controller for Fairfield Greenwich (Bermuda)

Ltd., the Defendants' investment manager, to forward the information to the investor.

p.      In response to this same inquiry, McKenzie tried to find information regarding

accountant Horowitz (of Friehling & Horowitz).  On September 14, 2005, McKenzie informed

Tucker, Lipton, and others at FGG, that he had determined that Friehling was the firm's only

employee.   Tucker responded with "thank you."  Shockingly, the Defendants' manager did not,

however, take any action to further investigate BLMIS' accounting firm.

q.      As far as the Defendants knew, BLMIS had not been audited since at least 2004.

They were aware that Pricewaterhouse Coopers ("PwC") had reviewed aspects of BLMIS'

operations in 2002 and 2004.  These reviews, however, were not audits.  As PwC explained in a

communication with Lipton regarding the 2004 review, the "procedures performed [did] not

constitute an audit nor an investigation of the internal controls of/at BLM."

r.      Despite its immense size, BLMIS was essentially a family-run operation,

employing many of Madoff's relatives, and virtually no outside professionals.

*Lack of Transparency*

s.       Madoff cloaked his and BLMIS' operation in secrecy.  Investors that questioned

BLMIS' investment methodology were threatened with removal from BLMIS programs and

BLMIS did not allow any real-time electronic access to trading, which is customarily provided in

the industry to significant, sophisticated hedge fund investors like the Defendants.  A May 27,

2001 Barron's article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even

asks investors to keep mum" noted the skepticism on Wall Street and lack of transparency

around BLMIS' IA Business based on his unwillingness to answer questions about his

investment strategy.

t.       In addition, BLMIS placed restrictions on the disclosures the funds could make to

their underlying investors regarding its operations.  For example, Defendants described BLMIS

as the execution agent of their split-strike strategy but did not disclose  BLMIS' complete

authority to make all investment decisions to implement the split-strike strategy.

u.       This lack of transparency ultimately interfered with FGG's business strategy.  In

2007, FGG tried to sell a stake in their business, but potential buyers wanted access to BLMIS'

records.  After FGG told them that BLMIS would not allow prospective investors to view its

books, FGG was unable to find a buyer.

v.       Even the Defendant funds did not have a clear understanding of BLMIS'

investment strategy.  Amit Vijayvergiya, Chief Risk Officer of FGG, acknowledged in an email

that, as late as August 19, 2008, there were "certain aspects of BLM's operations that remain[ed]

unclear." The Defendant funds' manager sent a questionnaire to BLMIS in September 2008, many years after the Defendant funds had already begun to invest billions of their clients' money with BLMIS, and requested relatively basic information regarding its operations. Madoff refused to answer a number of the questions, including requests that it identify the individuals who were implementing the split-strike strategy.

w.    BLMIS also utilized outmoded technology, including paper trading confirmations which were sent daily via U.S. mail to the fund administrator for the benefit of the fund. This was particularly suspicious given that BLMIS claimed that it had an automated order and execution process for the split-strike strategy and that Madoff had a reputation as an early and enthusiastic proponent of electronic trading. In addition, the Defendant funds' manager did not receive these trade confirmations until three to five days after a trade had been entered. This practice made it impossible for the Defendants to stay true to the promise in their marketing materials that they monitored the positions and risk profiles of their investments on a *daily* basis. Furthermore, the trade confirmations that the Defendants received did not always contain the prices at which a security was bought or sold, but rather weighted average prices of a group of securities supposedly bought and sold during the day. The use of paper confirmations created after the fact was critical to Madoff's and BLMIS' ability to perpetuate the Ponzi scheme.

*Skepticism by Others in the Industry and by the Defendants' Customers*

x.    Representatives of the Defendant funds' manager were present at a 2000 meeting at which Credit Suisse raised concerns about BLMIS' auditor, its service as custodian for its customers' assets, and the fact that Madoff would not say how much money he managed. Credit

Suisse urged its customers to withdraw their money from BLMIS because Credit Suisse could

not determine how the money was made.

y.      A May 2001 MAR/Hedge newsletter entitled, "Madoff Tops Charts; Skeptics Ask

How," reported on Fairfield Sentry's consistent returns and said that experts were bewildered

and did not know how such returns could be achieved so consistently and for so long.  The

article observed that "others who use or used the strategy are known to have had nowhere near

the same degree of success."  This is a widely read newsletter by participants in the fund of fund

and hedge fund industry.   The May 2001 Barron's article referenced in subparagraph s raised

similar skepticism in the industry about the credibility of BLMIS' reported compound average

returns of 15% for over a decade.

z.      Based on all of the foregoing factors, many banks, industry advisors and insiders

who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS

because they had serious concerns that BLMIS' IA Business operations was not legitimate.  On

information and belief, included among these entities were Société Génerale, Goldman Sachs,

CitiGroup, Morgan Stanley, Merrill Lynch, and Credit Suisse.  In 2003, for example, a team

from Société Génerale's investment bank performed due diligence on BLMIS.  Société Génerale

found that BLMIS' numbers did not add up and forbade its investment bank from doing business

with BLMIS.

aa.      Similarly, Aksia, LLC, an independent hedge fund research and advisory firm had

advised its clients in 2007 against investing with BLMIS, Madoff, or any of his feeder funds

because of certain red flags.  Simon Fludgate, head of operational due diligence at Aksia,

concluded that the stock holdings reported in the quarterly statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS claimed to be managing.

bb.    Simon Ruddick, the managing director of Albourne Partners, a London due diligence firm, has said that Albourne had urged customers for nearly a decade to avoid BLMIS. A Fort Worth pension fund that received advice from Albourne voted unanimously to redeem its BLMIS investments in July 2008.

cc.    Robert Rosenkranz of Acorn Partners, an investment advisor for high net worth individuals, conducted due diligence of BLMIS and also found it likely that BLMIS' account statements were generated as part of a fraudulent scheme.

dd.    Amidst the skepticism and concerns expressed by a number of experienced investment professionals in the industry, Andres Piedrahita, a founding partner of FGG and a member of its executive committee, was pressed at a 2007 meeting of other money managers to explain how the Defendant funds generated performance.  Piedrahita could not provide an explanation.

ee.    By the Fall of 2008, the Defendants were aware that a number of their customers were redeeming their shares in Defendants' funds and that the redemptions were due, at least in part, to concerns over BLMIS' investment operations.  For example, on June 10, 2008, Vijayvergiya sent an email to McKenzie and others in which he suggested that, with regard to customers who were redeeming their shares in Fairfield Sentry, they ask whether the redemptions were related to the lack of transparency or to concerns over BLMIS.  Then, no later than July 2008, Defendants became aware that one of their customers intended to redeem a substantial amount of shares in Fairfield Sentry, due, at least in part, to insufficient information

to evaluate the BLMIS' risks.  This redemption ultimately prompted Defendants to submit the

due diligence questionnaire referenced in subparagraph (v).

ff.      Defendants were also aware that concerns relating to BLMIS were discouraging

clients from investing with Defendants.  For example, David Horn, a partner and Chief Global

Strategist of FGG, emailed Vijayvergiya on June 2, 2008 about a prospective client.  The email

stated that the client "has always heard about Madoff, but hears things that scare her."

*BLMIS' SEC Filings and Involvement in SEC Investigations*

gg.      The information contained in BMLIS' Form 13F filed with the SEC was not

consistent with the trades that BMLIS was allegedly executing on behalf of the funds.  For

instance, even though the funds contained at least $13 billion, BLMIS' Form 13F in August 2008

showed only scatterings of small positions in small (non-S&P 100) equities with a total value of

less than $325 Million.

hh.      In 2005, the SEC was conducting an investigation of BLMIS.  Pursuant to this

investigation, Madoff had a telephone call with McKeefrey and Vijayvergiya in December 2005.

The call began as follows:

> MADOFF:  Obviously, first of all, this conversation never took
> place, Mark, okay?
>
> VIJAYGERGIYA:  Yes, of course.
>
> MADOFF:  All right . . .

During this call, McKeefrey and Vijayvergiya told Madoff of their upcoming meeting with the

SEC and Madoff gave them precise instructions as to what to say in response to questions from

SEC attorneys.  For instance, Madoff told McKeefrey and Vijayvergiya to tell the SEC that he

was not acting as an investment adviser because he was not a registered investment advisor.  The

fact that Madoff did not want the Defendants to disclose true and accurate information about

BLMIS to the SEC should have put the Defendants on notice that Madoff was engaged in illegal

activities for which he wanted to BLMIS to avoid regulatory scrutiny.

     ii.     The SEC continued to investigate Madoff and BLMIS in January 2006 because

Madoff had misled the Examination staff about the nature of the strategy BLMIS used and had

withheld information about certain customer accounts.  The SEC interviewed Tucker as part of

the investigation.  Thus, the Defendants knew that Madoff and BLMIS were being investigated

by the SEC and were aware of some of the allegations.

     jj.     On information and belief, in or about November 2005, in addition to consulting

with Madoff regarding the SEC inquiries, the Defendants conferred with Madoff regarding

completion of their Form ADV Part II, so that BLMIS would not appear to have violated the

SEC's registration requirements for investment advisors.

     kk.     Defendants did these things despite the fact that they knew or should have known

that 2005 was not the first time BLMIS' IA Business was the subject of an SEC enforcement

action.  As far back as December 16, 1992, an article in the Wall Street Journal, which was easily

accessible to the Defendants, reported an SEC investigation of two accountants – Frank Avellino

and Michael Bienes – who had illegally raised money for Madoff and BLMIS.  The SEC charged

Avellino and Bienes with operating an unregistered investment company and selling unregistered

securities.

     ll.     The SEC was not the only federal entity interested in BLMIS' operations.  The

Financial Industry Regulatory Authority ("FINRA"), and its predecessor entity, National

Association of Securities Dealers ("NASD"), instituted regulatory actions against BLMIS in 1963, 1975, 2005, 2007, and 2008.

41.     The Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

42.     The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts ("Fictitious Profits").

43.     The Transfers are avoidable and recoverable under sections 544, 547, 548(a), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and applicable provisions of N.Y. CPRL 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273 – 276 (McKinney 2001).

44.     Defendants were among the beneficiaries of this scheme, receiving Transfers from BLMIS totaling more than $3.5 billion since December 1995 alone.  Of the Transfers, multiple Transfers in the collective amount of approximately $3.2 billion (the "Six Year Transfers") were made during the six years prior to the Filing Date and are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273 – 276.

45.     Of the Six Year Transfers, multiple Transfers in the collective amount of $1.7 billion (the "Two Year Transfers") were made during the two years prior to the Filing Date, and are additionally recoverable under sections 548(a)(1), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

46.    Of the Two Year Transfers, multiple Transfers in the collective amount of $1.2 billion (the "90 Day Transfers") were made during the 90 days prior to the Filing Date, and is additionally recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

47.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

48.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information on the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE
## TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

49.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

50.    The Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

51.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to the immediate payment and turnover from the Defendants of any and all Transfers made by BLMIS, directly or indirectly, to any Defendant.

52.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is also entitled to an accounting of all such Transfers received by any Defendant from BLMIS, directly or indirectly.

## COUNT TWO
## PREFERENTIAL TRANSFERS – 11 U.S.C. §§ 547(b), 550 AND 551

53.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

54.    At the time of each of the 90 Day Transfers (hereafter, the "Preference Period Transfers"), the Defendants were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

55.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

56.    Each of the Preference Period Transfers was to or for the benefit of a Defendant.

57.    Pleading in the alternative, each of the Preference Period Transfers was made on account of an antecedent debt owed by BLMIS before such transfer was made.

58.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

59.    Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

60.    Each of the Preference Period Transfers enabled each of the Defendants to receive more than the receiving Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

61.     Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the applicable Defendant pursuant to section 550(a).

62.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551

63.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

64.     The Two Year Transfers were made on or within two years before the filing date of BLMIS' case.

65.     The Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

66.     The Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) and SIPA § 78fff-2(c)(3).

67.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding

and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550 AND 551

68.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

69.    The Two Year Transfers were made on or within two years before the Filing Date.

70.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

71.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

72.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

73.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

74.     The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee

pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants

pursuant to section 550(a) and SIPA § 78fff-2(c)(3).

75.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of

the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding

and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside,

and (c) recovering the Two Year Transfers, or the value thereof,  from the Defendants for the

benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551

76.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

77.     At all times relevant to the Six Year Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under section 502 of the Bankruptcy Code or that were and are not

allowable only under section 502(e).

78.     The Six Year Transfers were made by BLMIS with the actual intent to hinder,

delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the

benefit of the Defendants in furtherance of a fraudulent investment scheme.

79.     As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of

the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy

Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and

preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c)

recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of

the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

**COUNT SIX**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107**

80.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

81.     At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

82.     BLMIS did not receive fair consideration for the Six Year Transfers.

83.     BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the

alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

84.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 273, 278 and 279 of the New York Debtor and Creditor Law and sections 544(b), 550,

551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year

Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year

Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT SEVEN
### FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107

85.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

86.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

87.     BLMIS did not receive fair consideration for the Six Year Transfers.

88.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

89.     As a result of the foregoing, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers , or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT EIGHT
### FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A) AND 551

90.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

91.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

92.     BLMIS did not receive fair consideration for the Six Year Transfers.

93.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

94.     As a result of the foregoing, pursuant to sections 275, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT NINE
## UNDISCOVERED FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

95.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

96.     At all times relevant to Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

97.     At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

98.     The Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

99.     As a result of the foregoing, pursuant to NY CPLR 203(g), sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

<u>COUNT TEN</u>
<u>OBJECTION TO DEFENDANTS' SIPA CLAIM</u>

100.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

101.    One or more Defendants has filed, or will file, a SIPA claim.

102.    Defendants' claims (the "Claims") are not supported by the books and records of BLMIS nor the claim materials submitted by Defendants, and, therefore, should be disallowed.

103.    The Claims also should not be allowed as general unsecured claims.  Defendants

are the recipients of transfers of BLMIS' property which are recoverable under sections 547, 548

and 550 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), and Defendants have not returned the

Transfers to the Trustee.  As a result, pursuant to section 502(d), the Claims must be disallowed

unless and until the Defendants return the Transfers to the Trustee.

104.    As a result of the foregoing, the Trustee is entitled to an order disallowing the

Claims.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against the Defendants as follows:

i.    On the First Claim for Relief, pursuant to section 542, 550(a) and 551 of the

Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) that the property that was the subject of the

Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by

the Defendants of the property that was the subject of the Transfers or the value of such property;

ii.    On the Second Claim for Relief, pursuant to sections 547, 550(a) and 551 of the

Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Preference Period

Transfer(s), (b) directing that the Preference Period Transfers be set aside, and (c) recovering the

Preference Period Transfers, or the value thereof, from the Defendants for the benefit of the

estate of BLMIS;

iii.    On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551

of the Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Two Year

Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two

Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS;

iv.      On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551

of the Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Two Year

Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two

Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS;

v.      On the Fifth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of

the New York Debtor & Creditor Law and sections 544(b), 550(a) and 551 of the Bankruptcy

Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing

that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering

attorneys' fees from the Defendants;

vi.      On the Sixth Claim for Relief, pursuant to sections 273, 278 and/or 279 of the

New York Debtor and Creditor Law and sections 544(b), 550 and  551 of the Bankruptcy Code

and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that

the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS;

vii.      On the Seventh Claim for Relief, pursuant to sections 274, 278 and/or 279 of the

New York Debtor and Creditor Law and sections 544(b), 550, 551 and 1107 of the Bankruptcy

Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Fraudulent Transfers,

(b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or

the value thereof, from the Defendants for the benefit of the state of BLMIS;

viii.    On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279, Bankruptcy Code §§ 544(b), 550, 551 and 1107, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS;

ix.    On the Ninth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law, section 544(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

x.    On the Tenth Claim for Relief, that the claim or claims of Defendants be disallowed;

xi.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001, 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xii.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS' estate;

xiii.    On all Claims for Relief, assignment of Defendants' rights to seek refunds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

xiv.    Awarding the Trustee all applicable interest, costs, and disbursements of this

action; and

xv.    Granting Plaintiff such other, further, and different relief as the Court deems just,

proper, and equitable.

Date:  New York, New York
       May 18, 2009

                                         *s/David J. Sheehan*
                                         Baker & Hostetler LLP
                                         45 Rockefeller Plaza
Of Counsel:                              New York, New York 10111
                                         Telephone: (212) 589-4200
Thomas L. Long (0023127)                 Facsimile: (212) 589-4201
Sherri B. Lazear (0030546)               David J. Sheehan
Baker & Hostetler LLP                    Email: dsheehan@bakerlaw.com
65 East State Street, Suite 2100         Marc E. Hirschfield
Columbus, Ohio  43215                    Email: mhirschfield@bakerlaw.com
Telephone: (614) 228-1541
Facsimile: (614) 462-2616                *Attorneys for Irving H. Picard, Esq.,*
Thomas L. Long                           *Trustee for the SIPA Liquidation of Bernard L.*
Email: tlong@bakerlaw.com                *Madoff Investment Securities LLC*
Sherri B. Lazear
Email: slazear@bakerlaw.com